## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

**MATRIX DISTRIBUTORS, INC.,
PRIMED PHARMACEUTICALS, LLC,
and OAK DRUGS, INC.,**

     **Plaintiffs,**

     **v.**

**NATIONAL ASSOCIATION OF
BOARDS OF PHARMACY and
OPTUMRX, INC.,**

     **Defendants.**

Civ. No. 18-17462 (KM) (MAH)

**OPINION**

**KEVIN MCNULTY, U.S.D.J.:**

OptumRx, Inc., is a pharmacy benefit manager ("PBM") that administers the prescription drug benefits of health insurance plans. To that end, OptumRx contracts with pharmacies to dispense prescriptions to plan beneficiaries. As part of those contracts, OptumRx began requiring that pharmacies source drugs only from distributors accredited by the National Association of Boards of Pharmacy ("NABP"). Claiming that the accreditation requirement is unlawful, three distributors (Matrix Distributors, Inc., PriMed Pharmaceuticals, Inc., and Oak Drugs, Inc. ("Distributors")) sued OptumRx and NABP, which now move to dismiss. For the following reasons, OptumRx's and NABP's motions to dismiss the amended complaint (DE 165, 166) are **GRANTED**.[1]

---

[1]     Certain citations to the record are abbreviated as follows:

     DE = docket entry

     Am. Compl. = Amended Complaint (DE 158)

     OptumRx Mot. = OptumRx's Brief in Support of its Motion to Dismiss the Amended Complaint (DE 165-1)

     NABP Mot. = NABP's Brief in Support of its Motion to Dismiss the Amended Complaint (DE 166-2)

## I.   BACKGROUND

### A. The Drug Supply Chain

An overview of the relevant market may be helpful. The prescription drug supply chain involves (1) manufacturers, which make drugs to sell to (2) wholesale distributors, which sell drugs to (3) hospitals or pharmacies, which dispense drugs to (4) patients. (Am. Compl. ¶ 26.) The wholesale distribution market is dominated by primary distributors, with three firms alone accounting for 92% of the market. (*Id.* ¶ 28.) Below the primary distributors are secondary distributors, like the Distributors here. (*Id.* ¶ 30.)

Servicing this distribution chain are the PBMs. PBMs contract with health insurance providers to administer the prescription drug benefits in their plans. (*See id.* ¶ 17.) PBMs also contract with pharmacies to dispense covered prescriptions to members of the plans which the PBM administers. (*See id.* ¶ 19.) Pharmacies must contract with a PBM to serve patients covered by plans administered by that PBM. (*Id.* ¶ 46–48.) As a result, PBMs have a network of pharmacies and effectively act as a middleman between pharmacies and health insurers. (*See id.* ¶ 18.) OptumRx is one of the largest PBMs, with a network of 67,000 pharmacies. (*Id.* ¶ 4.)

This drug supply chain is regulated at the federal and state level. (*Id.* ¶¶ 123–24.) State boards of pharmacy play an active role, and all participate in

---

Pl. Opp. = Plaintiffs' Brief in Opposition to Defendants' Motions to Dismiss the Amended Complaint (DE 174)

OptumRx Reply = OptumRx's Reply Brief in Support of its Motion to Dismiss (DE 175)

NABP Reply = NABP's Reply Brief in Support of its Motion to Dismiss (DE 176)

AIPW Am. Compl. = Am. Compl., *Ass'n of Indep. Pharm. Wholesalers, Inc. v. OptumRx, Inc.*, No. 16-cv-02214-KBJ (D.D.C. Feb. 16, 2017) ("*AIPW*"), DE 26

*AIPW* Stip. = Stipulation of Dismissal with Prejudice, *AIPW*, DE 59

*AIPW* Mot. = Motion for Relief from Judgment by Matrix and PriMed, *AIPW*, DE 60-7

When referring to other docket entries in *AIPW*, I use the format "*AIPW*, DE _."

NABP. (*Id.* ¶¶ 49, 88.) NABP is led by an executive committee made up of current or former members of state boards. (*Id.* ¶¶ 57–61.) NABP provides several services to state boards: (1) a database on pharmacists (including their licensure, disciplinary history, and the like) (*id.* ¶ 64); (2) licensing exams or accreditation programs, some of which all states require (*id.* ¶¶ 65–67); (3) a data-sharing platform for prescription monitoring programs (*id.* ¶ 68); (4) inspection programs (*id.* ¶¶ 70, 72); and (5) model legislation and rules (*id.* ¶ 74). Most of NABP's revenue comes from applicant fees for its licensure or accreditation programs. (*Id.* ¶¶ 79–81.)

### B. The VAWD Requirement

At issue here is one of NABP's accreditation programs. The Verified-Accredited Wholesale Distributor ("VAWD") program aims to certify that distributors meet standards of supply chain integrity. (*Id.* ¶ 87.) NABP developed the VAWD program "under the direction of the state boards" as a "mechanism for inspecting and regulating wholesale distributors" to combat the distribution of counterfeit drugs. (*Id.* ¶ 88.) Under the program, NABP promulgated criteria for distributors, such as that they only distribute drugs purchased from manufacturers, or that they keep distribution facilities separate from other facilities. (*Id.* ¶¶ 109–22.) When a distributor seeks VAWD accreditation, NABP personnel assess the distributor's operations and inspect its facilities for compliance with those criteria. (*Id.* ¶ 94.) In four states (Indiana, Iowa, Wyoming, and North Dakota), VAWD accreditation has become a condition for obtaining a distribution license. (*Id.* ¶ 90.) In twenty-two states, VAWD accreditation entitles a distributor to regulatory relief (*i.e.*, waiver of certain licensing processes). (*Id.* ¶ 92.)

State regulators are not the only ones that utilize the VAWD program; PBMs like OptumRx do, too. (*See id.* ¶ 145.) OptumRx required its pharmacies to source drugs only from VAWD-accredited distributors. (*Id.* ¶ 148.) OptumRx made it known in 2016 that this VAWD requirement would be a part of its

contracts with pharmacies, so that failure to comply could result in a pharmacy's being ousted from its network. (*Id.* ¶ 152.)

Matrix unsuccessfully applied for accreditation and remains unaccredited by NABP. (*Id.* ¶¶ 185–201.) PriMed and Oak both faced denials before becoming accredited in 2019. (*Id.* ¶¶ 202, 225–26.) All the while, some pharmacies have ceased purchasing from the Distributors or declined to do business with them because of their difficulties in gaining VAWD accreditation. (*Id.* ¶¶ 260, 262–64.)

## C. The First Challenge to the VAWD Requirement

Aggrieved by the VAWD requirements, a trade association for secondary distributors, the Association of Independent Pharmaceutical Wholesalers ("AIPW"), sued OptumRx and federal agencies/officials in the United States District Court for the District of Columbia. (Compl., *Ass'n of Indep. Pharm. Wholesalers, Inc. v. OptumRx, Inc.*, No. 16-cv-02214-KBJ (D.D.C. Nov. 4, 2016) ("*AIPW*"), DE 1.) AIPW alleged that the VAWD requirement was unlawful because it (1) amounted to a federal rule that would require notice-and-comment rulemaking, (2) violated federal regulations, (3) violated federal rulemaking statutes, (4) violated California consumer protection law, and (5) tortuously interfered with distributors' contracts with pharmacies. (*Id.* ¶¶ 155–94.) An amended complaint specified that AIPW included Matrix and PriMed. (*AIPW* Am. Compl. ¶¶ 147–48.)[2]

Before the court could rule on pending motions to dismiss and for a preliminary injunction, the parties stipulated to a dismissal. Specifically, the parties notified the court that they had reached a confidential settlement, which would not be submitted. (*AIPW*, DE 57.) In response, the court issued an order stating that the case was dismissed without prejudice, but that if no party moved to reopen in a specified time, then the case would stand dismissed with prejudice. (*AIPW*, DE 58.) Before the reopening deadline passed, OptumRx

---

[2]     Oak was formed in 2018 (Am. Compl. ¶¶ 225–26), after OptumRx's implementation of the VAWD requirement and the *AIPW* litigation commenced.

and AIPW entered a stipulation of dismissal with prejudice. (*AIPW* Stip.)
Months later, Matrix and PriMed moved for relief from the dismissal and to
reopen the case, arguing that, while they were AIPW members, (1) they did not
consent to the settlement, (2) the agreement was "revised to reflect [their] non-
participation," and (3) the parties did not so inform the court. (*AIPW* Mot. at 1,
3, 4.) The court denied the motion in a minute order because Matrix and
PriMed were not "parties to this case." No activity has occurred since.

### D. This Challenge to the VAWD Requirement

A month after *AIPW* wound down, the Distributors brought a challenge to
the VAWD requirement against OptumRx and NABP in New Jersey Superior
Court, simultaneously moving for injunctive relief. The case was removed to
this Court. (DE 1.) I denied the motion for a temporary restraining order,
directed the parties to conduct expedited discovery, and then held a
preliminary injunction hearing. (DE 16, 122, 123.) During this time, Matrix
and PriMed's accreditation process was ongoing, and before I could rule on the
preliminary injunction motion, Matrix and PriMed achieved accreditation. (DE
150.) Accordingly, the Distributors withdrew the injunction motion and
amended the complaint. (DE 152, 153.)

The Amended Complaint asserts the following claims:

- Count 1: a claim against NABP and OptumRx by Matrix for a declaration,
  under the Declaratory Judgment Act, 28 U.S.C. § 2201, that certain
  VAWD criteria are preempted and an accompanying injunction
  prohibiting (1) NABP from enforcing those criteria and (2) OptumRx from
  excluding Matrix from selling to OptumRx pharmacies without
  accreditation (Am. Compl. ¶¶ 276–93);[3]

- Count 2: a claim against OptumRx for violating New York Public Health
  Law § 280-c, seeking a declaration that OptumRx is violating that law

---

[3]     The Distributors clarify that Count 1 is alleged only by Matrix against both
NABP and OptumRx. (Pl. Opp. at 5 & n.3.)

and an injunction allowing Matrix to sell to OptumRx pharmacies in New York (Am. Compl. ¶¶ 294–302);

- Count 3: a claim against NABP and OptumRx under 42 U.S.C. § 1983 for violations of the Drug Supply Chain Security Act ("DSCSA"), 21 U.S.C. § 360eee *et seq.*, and the Supremacy Clause, seeking damages (Am. Compl. ¶¶ 303–17);

- Count 4: a claim against NABP and OptumRx under § 1983 for violations of procedural due process under the Federal and New Jersey Constitutions, seeking damages (Am. Compl. ¶¶ 318–33);

- Count 5: a claim against NABP, in the alternative to Count 4, for violations of the common-law right to due process, seeking damages (*id.* ¶¶ 334–42);

- Count 6: a claim against OptumRx for tortious interference with contract, seeking damages (*id.* ¶¶ 343–79);

- Count 7: a claim against OptumRx for tortious interference with prospective economic advantage, seeking damages (*id.* ¶¶ 380–85);

- Count 8: a claim against OptumRx for tortious interference with the Distributors' wholesale licenses, seeking damages (*id.* ¶¶ 386–96); and

- Count 9: a claim against NABP, in the alternative if the Court finds that NABP is not a state actor, for violations of the New Jersey Consumer Fraud Act ("NJCFA"), N.J. Stat. Ann. § 56:8-2.1, seeking damages (Am. Compl. ¶¶ 397–405).

OptumRx and NABP now move to dismiss the Amended Complaint.

## II. DISCUSSION AND ANALYSIS

There are many claims and many more arguments for dismissal, but in sum, I hold as follows:

- Dismissal based on claim preclusion is not appropriate on this record.

- Counts 1, 3, and 4 are dismissed for failure to plead state action.

- Count 2 is dismissed because New York Public Health Law § 280-c is not enforceable via a private right of action.

6

- Count 5 is dismissed because New Jersey law does not recognize a common-law due process claim in this context.
- Counts 6, 7, and 8 are dismissed for failure to allege the element of intentional interference.
- Count 9 is dismissed for failure to allege a consumer transaction or ascertainable loss.

### A. Standard of Review

Federal Rule of Civil Procedure 8(a) does not require that a pleading contain detailed factual allegations. Nevertheless, "a [party's] obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see Phillips v. County of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008) (Rule 8 "requires a 'showing' rather than a blanket assertion of an entitlement to relief." (citation omitted)). Thus, the factual allegations must be sufficient to raise a claimant's right to relief above a speculative level, so that a claim is "plausible on its face." *Twombly*, 550 U.S. at 570. That facial-plausibility standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While "[t]he plausibility standard is not akin to a 'probability requirement' . . . it asks for more than a sheer possibility." *Id.*

Rule 12(b)(6) provides for the dismissal of a complaint if it fails to state a claim upon which relief can be granted. The moving party bears the burden of showing that no claim has been stated. *See Animal Sci. Prods., Inc. v. China Minmetals Corp.*, 654 F.3d 462, 469 n.9 (3d Cir. 2011). For the purposes of a motion to dismiss, the facts alleged in the pleading are accepted as true and all reasonable inferences are drawn in favor of the plaintiff. *N.J. Carpenters & the Trs. Thereof v. Tishman Constr. Corp. of N.J.*, 760 F.3d 297, 302 (3d Cir. 2014).

**B. Claim Preclusion**

The first issue is whether the *AIPW* case bars this entire suit. "[C]laim preclusion prevents parties from raising issues that could have been raised and decided in a prior action . . . ." *Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, 140 S. Ct. 1589, 1594 (2020). Claim preclusion[4] requires three elements: "(1) a final judgment on the merits in a prior suit involving (2) the same parties or their privies and (3) a subsequent suit based on the same cause of action." *Hoffman v. Nordic Naturals, Inc.*, 837 F.3d 272, 279 (3d Cir. 2016) (citation omitted).[5]

Claim preclusion, an affirmative defense, "may not afford the basis for a Rule 12(b)(6) dismissal unless it is 'apparent on the face of the complaint.'" *Id.* at 280 (quoting *Rycoline Prods., Inc. v. C & W Unlimited*, 109 F.3d 883, 886 (3d Cir. 1997)). Still, I may consider the record of the prior case record or other materials subject to judicial notice. *Overseas Lease Grp., Inc. v. Plocher Constr. Corp.*, 800 F. App'x 79, 81, n.7 (3d Cir. 2020). Such consideration is appropriate when there are no factual disputes. *See Hoffman*, 837 F.3d at 280 & n.52. With my scope of review in mind and turning back to the elements, I conclude that I cannot apply claim preclusion here.

The first and third elements are straightforward enough.[6] The *AIPW* parties voluntarily dismissed the case with prejudice, following a settlement. (*AIPW* Stip.) That qualifies as a final judgment on the merits. *Papera v. Pa.*

---

[4]    "Claim preclusion" is also referred to as, or under the umbrella of, "res judicata."

[5]    To determine the preclusive effect of a federal-court judgment, I apply federal preclusion rules for judgments in federal-question cases and state preclusion rules for judgments in diversity cases, using the rules applied by the state in which the rendering court sits. *Taylor v. Sturgell*, 553 U.S. 880, 891 & n.4 (2008); *see also Graboff v. Am. Ass'n of Orthopaedic Surgeons*, 559 F. App'x 191, 194 (3d Cir. 2014). In *AIPW*, the amended complaint asserted jurisdiction based primarily on federal questions but also based on diversity. (*AIPW* Am. Compl. ¶¶ 30, 32.) The parties here rely on federal preclusion rules (Pl. Opp. at 53, OptumRx Mot. at 11–13), so I will too.

[6]    The Distributors do not dispute that these elements are met. (*See* Pl. Opp. at 52–59.)

*Quarried Bluestone Co.*, 948 F.3d 607, 610–11 (3d Cir. 2020) (voluntary dismissal with prejudice); *see also Martinez v. Bank of Am., N.A.*, 664 F. App'x 250, 254 (3d Cir. 2016) (settlement coupled with voluntary dismissal). This case involves "the same claim" because it "involve[s] a 'common nucleus of operative facts.'" *Lucky*, 140 S. Ct. at 1595 (quoting Restatement (Second) of Judgments § 24, cmt. b (1982)). Both complaints challenged the VAWD requirement. (*Compare* Am. Compl. ¶ 1, *with AIPW* Am. Compl. ¶ 1.) Although the legal theories and non-OptumRx defendants are not identical as between the two actions, courts focus on "the essential similarity of the underlying events giving rise to the various legal claims," *Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 277 (3d Cir. 2014) (citation and emphasis omitted), and the VAWD requirement is the basis for both suits. Thus, the first and third elements of claim preclusion are met.

But the second element—whether the same parties or their privies are present in both *AIPW* and here—implicates factual disputes. Claim preclusion generally does not operate against a person who was not party to a prior suit. *Taylor v. Sturgell*, 553 U.S. 880, 892–93 (2008). There are exceptions, however, and OptumRx and NABP rely on two. (OptumRx Mot. at 14–17; NABP Mot. at 11.) First, "a nonparty may be bound by a judgment because she was 'adequately represented by someone with the same interests who was a party' to the suit." *Taylor*, 553 U.S. at 894 (quoting *Richards v. Jefferson County*, 517 U.S. 793, 798 (1996)) (alteration omitted). Second, "nonparty preclusion may be justified based on a variety of pre-existing substantive legal relationships between the person to be bound and a party to the judgment." *Id.* (quotation marks, alteration, and citation omitted).

Based on the limited *AIPW* record, there remains at least a factual issue as to whether Matrix and PriMed were "adequately represented" by AIPW when it settled and dismissed the case; relatedly, it cannot be stated definitively whether Matrix and PriMed, at the time of settlement, still had a "legal relationship[]" with AIPW such that AIPW could bind them. *Taylor*, 553 U.S. at

894 (citation omitted); *see also Black Clawson Co. v. Kroenert Corp.*, 245 F.3d 759, 763–64 (8th Cir. 2001) (nonparty to settlement could not be precluded by settlement).

Cases involving alleged privity between an association and its members often require a fact-intensive inquiry, and "great care should be taken before binding all members to an association loss." *Cigar Ass'n of Am. v. U.S. Food & Drug Admin.*, 436 F. Supp. 3d 70, 82–83 (D.D.C. 2020) (citation omitted); *see also* 18A Charles Alan Wright et al., *Federal Practice & Procedure* § 4456 (3d ed. 2020 update) (explaining how "confused" preclusion becomes when applied to associations). All I can tell from the *AIPW* record is that AIPW settled and dismissed the case and that Matrix and PriMed disputed their involvement. I am not free, on a motion to dismiss, to accept as true the assertions made in Matrix and PriMed's motion for relief from judgment; I can only notice their existence. *See In re Lipitor Antitrust Litig.*, 868 F.3d 231, 269 (3d Cir. 2017) (improper to "[t]ak[e] judicial notice of the truth of the contents of a filing from a related action" (citation omitted)); *S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp., Ltd.*, 181 F.3d 410, 427 n.7 (3d Cir. 1999) (distinguishing between taking notice of existence of documents versus the facts or arguments asserted therein). Their existence is sufficient to demonstrate that there is a factual dispute, but not to resolve it. *Cf. Parker v. Estate of Katherine Parker Blair*, Civ. No. 19-21093, 2020 WL 6707963, at *3–4 (D.N.J. Nov. 16, 2020) (explaining that it is proper to consider past records "to identify what they decided and what collateral estoppel effect they may have had"). In sum, applying non-party preclusion principles with any certainty to the sketchy facts here is not possible.

Other issues, too, are inappropriate for resolution on a motion to dismiss. Neither Oak nor NABP was a party to *AIPW*. For claim preclusion to apply to Oak, Oak would need to have been in privity with AIPW. *See Vasquez v. Bridgestone/Firestone Inc.*, 325 F.3d 665, 676–77 (5th Cir. 2003) (analyzing whether additional plaintiffs were in privity with prior ones); *cf. Smith v. Bayer*

*Corp.*, 564 U.S. 299, 313 (2011) (plaintiff who was an unnamed member of a proposed but uncertified class in a prior suit was not precluded from later pursuing claim against same defendant). The Amended Complaint here makes no mention of AIPW, and, since Oak was formed after the *AIPW* action concluded, the *AIPW* record contains nothing about Oak. So there are no materials within my scope of review to determine Oak's privity.

As to NABP, if I find that the Distributors were in privity with AIPW, NABP could invoke claim preclusion against them. That would require, however, a showing that "there is [or was] a close or significant relationship between" NABP and OptumRx. *Lubrizol Corp. v. Exxon Corp.*, 929 F.2d 960, 966 (3d Cir. 1991) (citation omitted); *see also Zahl v. Warhaftig*, 655 F. App'x 66, 73 (3d Cir. 2016). The parties argue as to whether NABP can enforce claim preclusion, yet fail to cite any materials (let alone those appropriate for a motion to dismiss) as support. (Pl. Opp. at 54; NABP Mot. at 11.) Given these outstanding issues, resolution of claim preclusion at this juncture is not appropriate. *See Hoffman*, 837 F.3d at 280.

Both parties ask me to consider various documents submitted in the preliminary injunction hearing, find certain facts, and use them as a basis for resolution of the issue of claim preclusion. (OptumRx Mot. at 15–17; Pl. Opp. 56–58.) To ascertain facts from the contents of those documents would exceed the proper scope of a motion to dismiss. *Lipitor*, 868 F.3d at 268–69; *see also Brody v. Hankin*, 145 F. App'x 768, 772 (3d Cir. 2005) (district court improperly "not only noticed the existence of the arbitration award, but seemed to notice facts found in that document"). To argue otherwise, OptumRx relies on *RealNetworks, Inc. v. DVD Copy Control Ass'n, Inc.*, No. 08-4548, 2010 WL 145098, at *4 (N.D. Cal. Jan. 8, 2010). (OptumRx Reply at 3–4.) There, the court used admissions made in a preliminary injunction hearing when deciding a later-filed motion to dismiss. *RealNetworks*, 2010 WL 145098, at *4. *RealNetworks*, however, cannot be squared with Third Circuit precedent. *E.g., S. Cross*, 181 F.3d at 427 n.7 ("[A] court that examines a transcript of a prior

11

proceeding to find facts converts a motion to dismiss into a motion for summary judgment." (citing *Kauffman v. Moss*, 420 F.2d 1270, 1274–75 (3d Cir. 1970))).

I understand the *RealNetworks* court's aversion to "pretend[ing]" that the "admissions and concession already made in [the] action" simply "do not exist." *RealNetworks*, 2010 WL 145098, at *4. But the purpose of a motion to dismiss is not to test a case's facts, even if some have already been elicited, but only to test the sufficiency of a complaint's allegations. Further, it would strain fairness to rely on evidence submitted at a preliminary injunction hearing to dismiss a complaint. Such a hearing involves a limited presentation, sometimes after limited discovery. *See St. Thomas-St. John Hotel & Tourism Ass'n v. Gov't of U.S.V.I.*, 357 F.3d 297, 301 (3d Cir. 2004) (citation omitted). The purpose of a motion to dismiss, however, is to weed out allegations that would not establish a cause of action even *if* fully developed, after full discovery, at summary judgment or trial. Dismissing a complaint based on provisional findings in connection with a preliminary injunction is not appropriate. *See Lipitor*, 868 F.3d at 268 (citing *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir. 2009), for the proposition that a court, on a motion to dismiss, improperly relies on the record in an earlier case because "the record in this case could be different following discovery").

For these reasons, I will deny OptumRx's and NABP's motions to dismiss to the extent they seek dismissal based on claim preclusion.

### C. Count 1: Preemption

Count 1 seeks a declaration that the VAWD requirement is preempted by the DSCSA and an injunction prohibiting NABP from enforcing the criteria and prohibiting OptumRx from applying the requirement to Matrix. (Am. Compl. ¶¶ 276–93.) NABP and OptumRx move to dismiss on four grounds: (1) neither the Declaratory Judgment Act ("DJA") nor the Supremacy Clause confers a cause of action based on preemption (NABP Mot. at 27–28; OptumRx Mot. at 18–19); (2) the DSCSA's preemption provision applies to "States" or "political

subdivisions," which NABP and OptumRx are not (NABP Mot. at 23, 25–26; OptumRx Mot. at 19–20); (3) if the Court nonetheless applies the state action doctrine so that they may qualify as a "State," the Amended Complaint fails to plead state action (NABP Mot. at 11–12; OptumRx Mot. at 19–24); and (4) regardless, the VAWD requirement is not preempted (NABP Mot. at 24–26; OptumRx Mot. at 24–27). I address the first three arguments and need not reach the fourth.

### 1. Cause of Action

The Supremacy Clause provides that federal law "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. Art. VI cl. 2. "Congress may consequently pre-empt, *i.e.*, invalidate, a state law through federal legislation." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376 (2015).

In *Armstrong v. Exceptional Child Center, Inc.*, the Supreme Court clarified that the Supremacy Clause

> is not the 'source of any federal rights,' and does not create a cause of action. It instructs courts what to do when state and federal law clash, but is silent regarding who may enforce federal laws in court, and in what circumstances they may do so.

575 U.S. 320, 324–25 (2015) (quoting *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 107 (1989)). Thus, NABP and OptumRx are correct that, under *Armstrong*, the Supremacy Clause itself cannot be the source of the Distributors' cause of action.[7]

---

[7]    The Distributors (at 8–9) point to Third Circuit cases predating *Armstrong* which hold that the Supremacy Clause does directly create a private right of action. *St. Thomas*, 218 F.3d at 241; *see also Lewis v. Alexander*, 685 F.3d 325, 345–46 (3d Cir. 2012). It may not be possible to reconcile such holdings with *Armstrong,* which the Third Circuit has yet to address. *Compare Lewis*, 685 F.3d at 345 ("the Supremacy Clause creates an independent right of action"), *with Armstrong*, 575 U.S. at 326 ("the Supremacy Clause . . . certainly does not create a cause of action"). I need not definitively opine on the continuing status of those earlier Third Circuit holdings, however, because I find that plaintiffs possess a cause of action under the narrower rule of *Armstrong.*

But *Armstrong* did not end there. The Court further explained that, under "long recognized" principles of equity jurisdiction, plaintiffs can seek an injunction preventing violations of federal law by officials. *Id.* at 326. Accordingly, "if an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted." *Id.* The upshot is that preemption claims, while not authorized by the Supremacy Clause itself, can be brought under a court's inherent equity jurisdiction. *Id.* at 327.[8]

Count 1 seeks a declaration that the VAWD requirement is preempted, as well as an injunction against its application. Thus, Count 1 may permissibly be viewed as an equitable claim under *Armstrong. Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 144 (2d Cir. 2016); *see Waterfront Comm'n of N.Y. Harbor v. Governor of N.J.*, 961 F.3d 234, 238 (3d Cir. 2020) (court had jurisdiction over claims that sought a declaration that a state law was preempted). Now NABP and OptumRx are surely correct that "the DJA 'does not create a cause of action courts may be compelled to enforce.'" (NABP Reply at 3 (quoting *In re AZEK Bldg. Prods., Inc., Mktg. & Sales Pracs. Litig.*, 82 F. Supp. 3d 608, 624–25 (D.N.J. 2015)).) The DJA does, however, "provide[] a remedy for controversies otherwise properly within the court's subject-matter jurisdiction," *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 394 (3d Cir. 2016). An *Armstrong*-style claim like this one does properly lie within the court's equitable powers. A declaratory judgment may therefore be rendered in service of such a claim.

---

[8]     This cause of action is therefore to be distinguished from the statutory claim under 42 U.S.C. § 1983 that is asserted in Count 3.

Equity follows the law, and *Armstrong* also held that equity jurisdiction to hear preemption claims can be "subject to express and implied statutory limitations." 575 U.S. at 327. That is, if the federal statute explicitly or implicitly "precludes private enforcement" of its preemption provisions, a plaintiff "cannot, by invoking [a court's] equitable powers, circumvent Congress's exclusion of private enforcement." *Id.* at 328. NABP and OptumRx do not, however, argue that the DSCSA precludes private enforcement of its preemption provision.

The motion to dismiss the injunctive and DJA claims on these grounds is therefore denied.

### 2. Applicability of the DSCSA

Count 1 alleges that the VAWD requirement is "expressly preempted" by the DSCSA. (Am. Compl. ¶ 277.) The DSCSA regulates the drug supply chain and establishes standards for wholesale distributors. 21 U.S.C. §§ 360eee–360eee-3. The DSCSA also provides that "no State or political subdivision of a State" may impose inconsistent standards, requirements, or regulations. *Id.* § 360eee-4(a), (b)(1). NABP and OptumRx argue that, under the statute's plain text, NABP[9] is not a "State" or "political subdivision," so its actions cannot be preempted. (NABP Mot. at 23, 25–26; OptumRx Mot. at 19–20.) The Distributors, however, assume that I may apply the state action doctrine to find that NABP is the equivalent of a "State." (*See* Pl. Opp. at 19–20.)

In express preemption cases,[10] the scope of the preemption is determined by the language of the federal statute. *See, e.g.*, *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 517 (1992). The DSCSA, by its express terms, applies to a "State" or "political subdivision." Arguably such language is confined to actions by one of the fifty states of the union (classically, state legislation), or an arm of such a

---

[9]   I refer mainly to NABP because the Amended Complaint alleges that NABP is a state actor because of its services to and relationship with states (Am. Compl. ¶¶ 49–93) OptumRx, too, is characterized as a state actor, but that status is attributed to its association with NABP (*id.* ¶¶ 241–46). So state action turns on whether NABP qualifies.

[10]   The Amended Complaint only alleges that the VAWD requirement is expressly preempted. (*See* Am. Compl. ¶¶ 1, 277, 314.) The Distributors' brief likewise focuses on express preemption (Pl. Opp. at 5–19) but also refers to "Congress' intent to occupy the field" (*id.* at 13), perhaps a passing reference to field preemption. I will confine my analysis to express preemption, however, because (1) any field or conflict preemption theory does not have a basis in the Amended Complaint, *see Jones v. Treece*, 774 F. App'x 65, 67 (3d Cir. 2019); *Commw. of Pa. ex. rel Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988); and (2) passing references in a brief are insufficient to raise a legal theory, *Yates Real Estate, Inc. v. Plainfield Zoning Bd. of Adjustment*, 404 F. Supp. 3d 889, 913 n.28 (D.N.J. 2019).

state (classically, regulations promulgated by a state administrative agency). Of course, NABP is not, *per se*, a "State."

Nonetheless, in certain contexts, the word "State" can be construed expansively to include private actors whose actions can be attributed to a state. For example, the Fourteenth Amendment provides that no "State" shall deny a person certain rights, U.S. Const. amend. XIV § 1, and 42 U.S.C. § 1983 provides a cause of action for deprivation of federal rights under color of "State" law. The Supreme Court has interpreted both to encompass "seemingly private behavior that 'may be fairly treated as that of the State itself'" in certain limited circumstances. *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 & n.2 (2001) (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 51 (1974)). This principle is known as the "state action" doctrine, and the Distributors argue that it should apply when interpreting and applying the DSCSA.[11]

I agree; when a private party stands in the shoes of a state, that party's actions may fall within the scope of the DSCSA's preemptive language. For that reading of the statute, I offer three reasons.

First, the state action doctrine is firmly established by judicial precedent. Congress was therefore presumptively aware that the word "State" could be interpreted to include a private entity acting in a state capacity. *See Guerrero-Lasprilla v. Barr*, 140 S. Ct. 1062, 1072 (2020) ("We normally assume that Congress is 'aware of relevant judicial precedent' . . . ." (quoting *Merck & Co. v. Reynolds*, 559 U.S. 633, 648 (2010))).

Second, in the context of other statutes, including at least one preemption provision, the Supreme Court has read "State" to extend beyond units of state government and include persons exercising the relevant state authority. *See City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 437 (2002) ("State" in preemption provision included local government

---

[11]   Of course, the state action doctrine applies directly to the § 1983 claim asserted in Count 3.

because they exercise power derived from the state); *Morse v. Republican Party of Va.*, 517 U.S. 186, 220 (1996) (Stevens, J., joined by Ginsburg, J.) (Voting Rights Act provision's application to "State" encompassed political parties because they have power over the electoral process); *id.* at 235–36 (Breyer, J., joined by O'Connor & Souter, JJ., concurring in the judgment) (same).

Third, I read this preemption provision in light of its clear purpose. *See Pennsylvania v. Navient Corp.*, 967 F.3d 273, 288 (3d Cir. 2020). Congress enacted the DSCSA to create a "[u]niform national policy" for drug supply chain regulation, 21 U.S.C. § 360eee-4 (section title), and fix the supply chain's vulnerability to counterfeit drugs—a vulnerability which, according to Congress, "exists, in large part, due to a patchwork of inconsistent State regulations," H.R. Rep. 113-83, at 24 (2013) (report on earlier bill). That purpose would be undermined if states could too easily circumvent the statute and re-institute the regulatory patchwork by outsourcing regulation to private actors.

For these reasons, I will analyze the Amended Complaint to determine if it adequately pleads that the actions of NABP were effectively those of a "State."

### 3. Application of the State Action Doctrine

There are multiple ways that "a private entity can qualify as a state actor," *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019) (collecting cases), but the "basic question" in every case is whether the conduct at issue "can be fairly attributed to the state," *Crissman v. Dover Downs Ent. Inc.*, 289 F.3d 231, 239 (3d Cir. 2002) (en banc). This is a "necessarily fact-bound inquiry," *Brentwood*, 531 U.S. at 298 (citation omitted), so ordinarily, resolution on the pleadings is not possible, *cf. Demetro v. Nat'l Ass'n of Bunco Investigations*, Civ. No. 14-6521, 2017 WL 3923290, at *13 (D.N.J. Sept. 2, 2017) (allegations that organization was composed of law enforcement officers and gathered information for criminal prosecutions were sufficient to go forward). Still, courts have dismissed complaints for failure to plead state action when the pleaded theory is fundamentally flawed as a matter of law.

*E.g.*, *Sharp v. Kean Univ.*, 153 F. Supp. 3d 669, 673 (D.N.J. 2015); *Colabella v. Am. Inst. of Certified Pub. Accts.*, No. 10-cv-2291, 2011 WL 4532132, *13 (E.D.N.Y. Sept. 28, 2011).

There is such a legal flaw in the Distributors' theory of liability. The error flows from the nature of the state action doctrine, which essentially requires, not only that the defendant perform a function that the states might typically perform, but that the defendant act as a surrogate for a particular, identified state. The Amended Complaint does not identify any particular state that was the source of NABP's alleged harm-causing conduct here.

Consider, for example, a hypothetical case in which the board of pharmacy in Rhode Island adopted the VAWD requirement and a distributor, assuming it had standing, challenged Rhode Island's incorporation and enforcement of that requirement. Or consider another hypothetical case in which Rhode Island delegated its regulatory powers over distributors to the VAWD program. In either case, we might more easily find that the authority of Rhode Island was being exercised. This is not such a case. Rather, this case uniquely involves a private actor adopting standards developed by another private actor, and a plaintiff's efforts to equate both actors' conduct with "state action," in the rather generic sense of this being the kind of thing that states do. Neither the Supreme Court nor the Third Circuit has ever found state action without first identifying *which* state the harm-causing conduct was attributable to.

The Distributors' theory, then, is that the NABP is effectively a *government* actor (although not a *particular state* actor) because it is made up of state pharmacy boards and its VAWD program was developed with involvement from multiple states. (*E.g.*, Am. Compl. ¶¶ 49, 89.) Supreme Court precedent forecloses that theory. In *NCAA v. Tarkanian*, the Court considered whether the NCAA could be liable as a state actor when a Nevada public university suspended a coach based on the NCAA's rules and investigation. 488 U.S. 179, 180–81 (1988). The Court held that the NCAA was not a state

actor because it had many members, across different states, so "the source of the legislation adopted by the NCAA is not Nevada but the collective membership, speaking through an organization that is independent of any particular State." *Id.* at 193 (citing *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 501 (1988) ("Whatever *de facto* authority the [private standard-setting] Association enjoys, no official authority has been conferred on it by any government . . . .") (alteration in original)).[12]

In *Brentwood, supra*, the Court explicated its *Tarkanian* holding, explaining that "it was difficult to see the NCAA, not as a collective membership, but as surrogate for the one State, [so] we held the organization's connection with Nevada too insubstantial to ground a state-action claim." 531 U.S. at 297–98. *Brentwood* further explained that "*Tarkanian* pointed to a contrary result . . . with an organization whose member public schools are all within a single State." *Id.* at 298. Accordingly, *Brentwood* distinguished *Tarkanian* and held that a Tennessee athletic association composed almost entirely of Tennessee public schools that regulated Tennessee sports was a Tennessee actor. *Id.* at 298–99. *Brentwood*'s grounds for distinguishing *Tarkanian,* however, only confirm that it is *Tarkanian* that controls here. *See Smith v. NCAA*, 266 F.3d 152, 159 (3d Cir. 2001) ("*Brentwood* did not abandon *Tarkanian*'s discussion and holding . . . it simply distinguished *Tarkanian*, pointing out that, in contrast to the state association before it, the NCAA's policies were not shaped by one state alone.").

---

[12] The *Tarkanian* majority and the dissent agreed that the NCAA, standing alone, is not a state actor. 488 U.S. at 193 n.13; *see also id.* at 202 n.2 (White, J., dissenting). The point of disagreement was whether the public university, "by embracing the NCAA's rules, transformed them into state rules and the NCAA into a state actor." *Id.* at 194 (majority); *see also id.* at 199 (dissent) ("The question here is whether the NCAA acted jointly with UNLV in suspending Tarkanian and thereby also became a state actor."). That analysis is not applicable here because the Distributors are not challenging the adoption and enforcement of the VAWD program by any state. Rather, they challenge a private actor's use of the VAWD program.

The upshot of *Tarkanian* and *Brentwood* is that nongovernmental associations with a collective, multistate membership—even those that might appear to be exercising quasi-regulatory, investigatory, and legislative functions—are not state actors, because their actions are not attributable to any particular state. *See Smith v. NCAA*, 266 F.3d at 159 ("[T]he NCAA's 'collective membership' of varying states largely motivated the holding in *Tarkanian* . . . ."). It is surely possible to argue the contrary, as a matter of logic, but that is the line that the Supreme Court has drawn. A closer relationship—one in which the private party is effectively a surrogate for an identified state—is required.

There is a caveat. There might be a case in which State A works through an association, which happens to be a multistate association, to take some action, and a plaintiff seeks to hold the association liable under a state action theory to the extent it was acting as a surrogate for State A. For example, a state regulatory agency could rely on an association's accreditation program, and a plaintiff denied accreditation in that state might challenge the association's decisions as to that particular state. *See McKeesport Hosp. v. Accred. Council for Grad. Med. Educ.*, 24 F.3d 519, 520–22 (3d Cir. 1994).[13] That description does not fit Count 1 of this Complaint. The VAWD program, and *a fortiori* its adoption by OptumRx, is not an action by any one state, but is more akin to "legislation adopted by . . . collective membership, speaking through an organization that is independent of any *particular* State."

---

[13]     Even then, state action is hard to prove. *McKeesport*, 24 F.3d at 525–26 (no state action because the state board did not "control or regulate the [organization's] standard-setting or decision-making processes" and "state law does not dictate or influence those actions"); *Tarkanian*, 488 U.S. at 194–95 (explaining that even a state court's adoption and enforcement of the American Bar Association ("ABA") Code of Professional Responsibility did not transform "the ABA's formulation of those disciplinary rules" into state action (citation omitted)).

*Tarkanian*, 488 U.S. at 193 (emphasis added).[14] And Count 1 seeks to invalidate VAWD across the board as being inconsistent with federal law.

My conclusion also comports with the text of the preemption provision. Recall that the DSCSA provides that "[n]o State or political subdivision" may adopt inconsistent regulations. Assume that "State," as used in DSCSA, is a term of art that includes a private entity acting as or on behalf of such a State. It still does not follow that a plaintiff may challenge a multistate entity's program without reference to its incorporation or enforcement by a particular state. Here, the Distributors argue that the VAWD program as a whole is preempted.

It is not sufficient, then, to point, as the Distributors do, to various indicia of the various states' involvement with the NABP. (Pl. Opp. at 19–28.) At a minimum, the Distributors must plead that a particular state uses the VAWD program and challenge that use as state action.[15] The same deficiency afflicts the Distributors' reliance on cases in which a court found state action based on entwinement or a symbiotic relationship. (*Id.*) All those cases involve, not generic "state" involvement, but a private entity's entwinement or relationship with a *particular* state in regard to *particular* conduct. *Brentwood*, 531 U.S. at 297–98 (Tennessee); *Mark v. Borough of Hatsboro*, 51 F.3d 1137, 1148 (3d Cir. 1995) (Pennsylvania); *Krynicky v. Univ. of Pittsburgh*, 742 F.2d 94, 101–03 (3d Cir. 1984) (Pennsylvania); *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 724–25 (1961) (Delaware); *see also P.R.B.A. Corp. v. HMS Host Toll Roads, Inc.*, 808 F.3d 221, 224 (3d Cir. 2015) ("[O]ur analysis should also focus on evidence

---

[14]   There are some cases where courts have found entities that operate across multiple states to be *federal* actors (although these cases do not arise under § 1983 or the Fourteenth Amendment). *E.g.*, *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 400 (1995) (Amtrak). But because the DSCSA preempts actions by a "*State*," the question is whether NABP acted like a particular state, so the federal-actor cases are inapposite.

[15]   True, the Amended Complaint alleges that "26 States formally utilize the VAWD program in some fashion." (Am. Compl. ¶ 92.) But the Distributors' injury focuses solely on OptumRx's use of the VAWD program. (*E.g.*, *id.* ¶¶ 1, 5.)

of explicit involvement of the governmental authority in the *specific action* the plaintiffs challenge.").[16]

To simplify a bit, the Amended Complaint cites generic indicia of state-like action, but never alleges that NABP acts as a surrogate for, or stands in the shoes of, any particular state. Because that is a fundamental deficiency under binding precedent, Count 1 will be dismissed.

## D. Count 2: New York Public Health Law § 280-c

Count 2 is a claim that OptumRx has violated New York Public Health Law § 280-c. (Am. Compl. ¶¶ 294–302.) Section 280-c sets forth PBMs' obligations when performing audits of pharmacies, but it does not expressly confer a private cause of action for enforcement. Count 2 must therefore be dismissed unless "a right of action is fairly implied in the statutory provision and its legislative history." *Haar v. Nationwide Mut. Fire Ins. Co.*, 138 N.E.3d 1080, 1083 (N.Y. 2019) (alterations and citation omitted). In assessing that issue, courts consider three "essential factors": "(1) whether the plaintiff is one of the class for whose particular benefit the statute was enacted; (2) whether recognition of a private right of action would promote the legislative purpose; and (3) whether creation of such a right would be consistent with the legislative scheme." *Id.* at 1084 (citation omitted).

Under the first *Haar* factor, I find nothing in the statutory text to indicate that the Distributors were the intended beneficiaries of § 280-c. Section 280-c is concerned with regulating the relationship between PBMs and pharmacies.

---

[16]     The Distributors rely on my own opinion in *Demetro* (Pl. Opp. at 26–27), where the defendant raised the state action issue "in passing," but it is distinguishable. *Demetro* involved the National Association of Bunco Investigators ("NABI"), a national organization consisting of law enforcement personnel who, using their positions, would gather information on an ethnic group and target members of that group for investigation or prosecution. 2017 WL 3923290, at *2. The plaintiff alleged that police officers/members from Woodbridge, New Jersey had misused their authority and targeted him in relation to a particular prosecution of him in New Jersey. On that and other grounds, I found that the complaint surmounted the state-action threshold and denied a motion to dismiss.

Such regulation is presumably to the pharmacies' benefit, because § 280-c(2) gives procedural protections, such as fair notice, to pharmacies when they are audited by PBMs. N.Y. Pub. Health Law § 280-c(2)(b) (McKinney 2020). "Wholesalers" (a classification that includes the Distributors here)[17] are only mentioned in one of eleven subsections. *Id.* § 280-c(2)(i). That subsection provides as follows: "When conducting an audit of a pharmacy's records, a [PBM] shall . . . in the case of invoice audits, accept as validation invoices from any wholesaler registered with the department of education from which the pharmacy has purchased prescription drugs." *Id.* Subsection (i) is aimed at allowing pharmacies to use a certain type of invoice (one from a wholesaler) as proof during an audit. That is a procedural benefit to the pharmacies, not a substantive right for the wholesalers.

Although failure to satisfy the first *Haar* factor is enough, I note that the other two factors do not support the Distributors, either. As for the second, any broader legislative purpose beyond the statutory enactment itself is unclear, as neither the enacted bill nor the bill jacket[18] contains a statement of purpose. 2018 N.Y. Sess. L., ch. 57, pt. MM; Bill Jacket, L. 2018, ch. 57. As for the third factor, a private right of action is not available "in instances where '[t]he Legislature . . . expressly provided for enforcement mechanisms' in the statute itself." *Cruz v. TD Bank, N.A.*, 2 N.E.3d 221, 265 (N.Y. 2013) (quoting *Mark G. v. Sabol*, 717 N.E.2d 1067, 1071 (N.Y. 1999)). The Public Health Law grants the Commissioner of Health and the Attorney General the power to seek civil penalties and injunctive relief for violations. N.Y. Pub. Health Law § 12.

---

[17]    The Amended Complaint alleges that the Distributors are all licensed wholesalers within the meaning of § 280-c. (Am. Compl. ¶ 298.)

[18]    In New York, a bill jacket collects pertinent legislative history materials for an enacted bill. *See Citizens Union of City of N.Y. v. Att'y Gen. of N.Y.*, 269 F. Supp. 3d 124, 140 (S.D.N.Y. 2017). Here I should note that, despite asking the Court to imply a private right of action, the Distributors only devoted a paragraph to applying the *Haar* factors and have provided no legislative history. Accordingly, they have arguably forfeited their defense of Count 2. *See Yates Real Estate*, 404 F. Supp. 3d at 913 n.28.

Accordingly, § 12 indicates an intent, at least by negative implication, to foreclose private enforcement.[19]

Because I cannot imply a private right of action to enforce New York Public Health Law § 280-c, Count 2 will be dismissed.

### E. Counts 3 and 4: § 1983 Claims

Count 3 is a preemption claim like Count 1 but brought under § 1983. (Am. Compl. ¶¶ 303–17.) Count 4 is also a § 1983 claim but for violations of procedural due process under both the Federal and New Jersey Constitutions. (*Id.* ¶¶ 318–33.) The claims fail for multiple reasons.

First, both fail because § 1983 claims require state action. *Sprauve v. W. Indian Co.*, 799 F.3d 226, 229 (3d Cir. 2015). For the reasons stated above, NABP and OptumRx are not state actors. (*See* Section II.C.3, *supra* (applying § 1983 state action standards by analogy).)

Second, Count 3 fails because § 1983 is generally not a vehicle for preemption claims. *Golden State*, 493 U.S. at 107–08. Rather, under § 1983, courts will analyze whether the federal statute which the plaintiff relies on creates a federal right. *Id.* at 108; *see also, e.g.*, *All. of Nonprofits for Ins., Risk Retention Grp. v. Kipper*, 712 F.3d 1316, 1325 (9th Cir. 2013). The creation of a federal right requires "'rights-creating language' clearly imparting an 'individual entitlement,' with 'an unmistakable focus on the benefitted class.'" *Lewis v. Alexander*, 685 F.3d 325, 345 (3d Cir. 2012) (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 287 (2002)). The Supremacy Clause, as noted above, contains no such rights-creating language. DSCSA, too, lacks any such language; it is

---

[19]     Other parts of the Public Health Law are not to the contrary. Although § 12 provides that it should not be construed to prevent "persons" from "the exercising of their respective rights to suppress nuisances or to prevent or abate pollution," N.Y. Pub. Health Law § 12(6), Count 2 is not a nuisance-type action. Although § 13 provides that "citizen[s]" may bring an Article 78 proceeding to enforce duties prescribed by the Law, *id.* § 13, "Article 78 is a form of proceeding available to compel *public* officials to comply with their responsibilities," *Vandor, Inc. v. Militello*, 301 F.3d 37, 39 (2d Cir. 2002) (citing N.Y. C.P.L.R. § 7801) (emphasis added), so § 13 is inapposite.

directed to the states ("No State . . . shall"), not to the distributors. *See Gonzaga*, 536 U.S. at 287 (explaining that the language "No person shall be subjected to discrimination" was "individually focused" while the language "[n]o funds shall be made available" was not (alterations omitted)). Further, the DSCSA statute's purpose is to protect and regulate the drug supply chain, not to confer a benefit on distributors. *See Kipper*, 712 F.3d at 1326–27. It might be said that distributors are incidentally benefited, in the sense that they are freed from being subject to a patchwork of state regulations; such a generalized, policy-based benefit is insufficient, because it does not create rights as between the parties here. *See Golden State*, 493 U.S. at 109 ("when congressional pre-emption benefits particular parties only as an incident of the federal scheme of regulation, a private damages remedy under § 1983 may not be available"); *see also Kipper*, 712 F.3d at 1326–27. Thus, the DSCSA cannot support a § 1983 claim.

Third, to the unclear extent that Count 4 may seek redress for violations of New Jersey law (Am. Compl. ¶ 330), that claim fails because § 1983 does not provide a general remedy on state-law grounds. *McMullen v. Maple Shade Township*, 643 F.3d 96, 99 (3d Cir. 2011). And the New Jersey Civil Rights Act ("NJCRA"), the vehicle for a state constitutional claim, is generally construed in parallel with § 1983 and generally requires state action. *See O'Toole v. Klingen*, Civ. No. 14-6333, 2017 WL 132840, at *5 (D.N.J. Jan. 13, 2017) (citing *Cottrell v. Zagami, LLC*, No. 08-3340, 2010 WL 2652229, at *4 (D.N.J. June 23, 2010) ("[The] NJCRA does not permit[] private suits against private persons absent state action.")).[20]

For these reasons, Counts 3 and 4 will be dismissed.

### F. Count 5: Common-Law Due Process

Count 5 assumes *arguendo* that NABP is not a state actor, as I have already found. It alleges that NABP, as a quasi-public organization, is

---

[20]    The subject of a potential due process claim under New Jersey state law that does not require state action, however, is covered in the following section.

nevertheless liable for violating the Distributors' common-law right to due process under New Jersey law. (Am. Compl. ¶¶ 334–42.) New Jersey law, however, does not recognize such a claim.

The New Jersey Supreme Court has recognized that where an organization is not a state actor subject to constitutional limitations but is "quasi-public," "its power to exclude must be reasonably and lawfully exercised in furtherance of the public welfare related to its public characteristics." *Matthews v. Bay Head Improvement Ass'n*, 471 A.2d 355, 366 (N.J. 1984). *Matthews*, the cases it relied on, and their progeny have all recognized this common-law due process right in the context of associations' exclusion or discipline of *members*. *Id.* at 366–67; *e.g.*, *Cipriani Builders, Inc. v. Madden*, 912 A.2d 152, 166–67 (N.J. Super. Ct. App. Div. 2006); *Stowell v. N.J. State Ass'n of Chiefs of Police*, 739 A.2d 1011, 1013 (N.J. Super. Ct. App. Div. 1999); *Schulz v. U.S. Boxing Ass'n*, 105 F.3d 127, 132 & n.9 (3d Cir. 1997). The Distributors are not members of NABP and do not seek membership. Rather, their claim is that NABP must comply with due process when making "accreditation decisions." (Am. Compl. ¶ 338.)

The Distributors have pointed to no New Jersey case, and I could locate none, in which a court recognized that common-law due process extends to accreditation decisions like NABP's. Recognizing such a claim would expand common-law due process, and "it is not the role of a federal court to expand state law in ways not foreshadowed by state precedent." *City of Philadelphia v. Beretta U.S.A. Corp.*, 277 F.3d 415, 421 (3d Cir. 2002); *see also Moe v. Seton Hall Univ.*, Civ. No. 09-01424, 2010 WL 1609680, at *4–5 (D.N.J. Apr. 20, 2010) (dismissing common-law due process claim when it was not foreshadowed).[21] On the contrary, New Jersey precedent follows a general rule

---

[21]     Some courts have recognized such a claim, *McKeesport*, 24 F.3d at 534–35 (Becker, J., concurring in the judgment) (collecting cases). Such recognition, however, is far from universal. *See Paine Coll. v. S. Ass'n of Colls. & Schs. Comm'n on Colls., Inc.*, 810 F. App'x 852, 856–57 (11th Cir. 2020) (per curiam). The relevant question here is

that associations, even quasi-public ones, should be free of judicial intervention except in limited, recognized circumstances. *See Matthews*, 471 A.2d at 326–27; *Davidovich v. Israel Ice Skating Fed.*, 140 A.3d 616, 633 (N.J. Super. Ct. App. Div. 2016). Given New Jersey's hands-off approach to associations and the lack of precedent recognizing a claim in circumstances like those here, I decline to expand common-law due process to the facts alleged.

The motion to dismiss Count 5 is therefore granted.

### G. Counts 6, 7, and 8: Tortious Interference

The Amended Complaint pleads claims against OptumRx for tortious interference with contract (Count 6), prospective economic advantage (Count 7), and the Distributors' wholesale licenses (Count 8). (Am. Compl. ¶¶ 343–96.) Those torts require "(1) a protected interest; (2) malice—that is, defendant's intentional interference without justification; (3) a reasonable likelihood that the interference caused the loss of the prospective gain; and (4) resulting damages." *Vosough v. Kierce*, 97 A.3d 1150, 1159 (N.J. Super. Ct. App. Div. 2014) (citation omitted).[22] The Distributors allege that (1) they have existing business or prospective relations with some OptumRx-network pharmacies (Am. Compl. ¶¶ 344, 347, 382); (2) OptumRx knew that the VAWD requirement would disrupt their relationships with pharmacies (*id.* ¶¶ 350–51, 382); and (3) due to the VAWD requirement, many OptumRx network pharmacies

---

whether New Jersey precedent authorizes such a claim, *Philadelphia*, 277 F.3d at 421; *Moe*, 2010 WL 1609680, at *4–5, and it does not.

[22] For tortious interference with contract, the first element involves showing an actual contract, while tortious interference with prospective advantage involves showing "a *prospective* contract or other economic benefit." *Interstate Realty Co. v. Sears, Roebuck & Co.*, Civ. No. 06-5997, 2009 WL 1286209, at *10 (D.N.J. Apr. 27, 2009) (citation omitted). Count 8, tortious interference with the Distributors' wholesale licenses, alleges that the protectable interest is the Distributors' enjoyment of the use of their wholesale licenses. (Am. Compl. ¶ 390.) OptumRx does not take issue with the proposition that licenses qualify as protectable contracts or business expectancies. (OptumRx Mot. at 39–40.)

stopped doing or declined to do business with the Distributors (*id.* ¶¶ 354, 382).

OptumRx takes issue only with the second element. (OptumRx Mot. at 35–39.) For that element, "[a]ctual knowledge of the contract with which a defendant supposedly interfered is a prerequisite to making out a claim." *Mylan, Inc. v. SmithKline Beecham Corp.*, 723 F.3d 413, 422 (3d Cir. 2013). The defendant must also "desire[] to bring [the interference] about or . . . know[] that the interference is certain or substantially certain to occur as a result of his action." *Dello Russo v. Nagel*, 817 A.2d 426, 434 (N.J. Super. Ct. App. Div. 2003) (citation omitted). That "prerequisite" means that a defendant must have knowledge of a specific contract and intend to interfere with *that* contract. *See Mylan*, 723 F.3d at 422 ("Apotex never saw the License Agreement, and there is no evidence in the record that it knew any specifics with regard to the Agreement's terms . . . . And without knowledge of the specific contractual right, Apotex cannot be deemed to have intentionally interfered with that right."). Accordingly, allegations that a defendant intended to interfere with a category of contracts or a plaintiff's business more generally are not enough—a tortious interference claim requires more targeted actions. *Cf. Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1170–71 (3d Cir. 1993) (once plaintiff established that defendant interfered with plaintiff's relations with three specific franchisees, the defendant could be liable for any other lost franchises, if reasonably foreseeable from the interference with the three franchisees).

In this court's view, the line drawn by the case law is a somewhat arbitrary one, but it is no less binding for that. And it is justified by the salutary policies of (a) preserving the distinction between tort and contract, and (b) precluding generalized claims that a business generally "harmed" the business of a competitor, a situation inherent in our economic system.

The Amended Complaint does not plausibly allege that OptumRx knew of any specific contracts between the Distributors and pharmacies, or that the VAWD requirement was intended to interfere with any specific contract. At the

outset, the Amended Complaint alleges only generalities: It identifies no specific pharmacies or contracts. Rather, it alleges that the VAWD requirement was intended to impair relations between secondary distributors and pharmacies as a general matter. (Am. Compl. ¶¶ 347–51, 367.) New Jersey law requires something more focused. The Amended Complaint needed to allege that OptumRx knew of a contract between a specific Distributor and at least one specific pharmacy and imposed the VAWD requirement with the intent to interfere with that contract. *See Mylan*, 723 F.3d at 422; *Lightning Lube*, 4 F.3d at 1170.

Nor are there allegations from which to infer OptumRx's actual knowledge and specific intent. OptumRx has a network of 67,000 pharmacies (Am. Compl. ¶ 4) and deals mainly with primary distributors (*id.* ¶ 28–30), while the Distributors sell to only a small portion of those pharmacies (*id.* ¶¶ 7, 10, 13). Given the size of OptumRx's operations and the Distributors' admittedly minor role, it is not plausible, without more specific allegations, that OptumRx actually knew of specific contracts between the Distributors' and individual pharmacies. Indeed, while the Distributors allege that they lost a specific number of customers due to the VAWD requirement (*id.* ¶¶ 262–64), they never allege any facts indicating that OptumRx would have had knowledge that specific customers (who are unidentified) did business with the Distributors.

The Amended Complaint does allege that OptumRx audits network pharmacies and, as a result, "knew" of relationships between the Distributors and pharmacies. (*Id.* ¶¶ 168, 172, 349.) That does not push these tortious interference allegations over the plausibility line, for two reasons. First, these audits would not reveal future or prospective purchases by a pharmacy, so the allegations would not support a claim for interference with prospective relations. Second, the Amended Complaint does not allege that these audits took place before the VAWD requirement was imposed. If anything, by placing these allegations under the subheading "Enforcement of the VAWD

Requirement," the Amended Complaint implies that these audits occurred after the VAWD requirement was imposed. The audits, then, do not support an inference that OptumRx intentionally interfered with those contracts when it imposed the VAWD requirement. *See Mylan*, 723 F.3d at 422.

Finally, even setting aside the knowledge requirement, the Amended Complaint would still lack a plausible, factual allegation that OptumRx desired or intended to interfere with the Distributors' contractual relations. *Dello Russo*, 817 A.2d at 434. There are no allegations that the purpose of the VAWD requirement was to affect any specific relationship between the Distributors and an OptumRx-network pharmacy. True, there are generalized allegations that the VAWD requirement was intended to encourage pharmacies to move their sourcing from secondary to primary distributors. (Am. Compl. ¶¶ 347–51, 367.) But even in that light, it is implausible that OptumRx imposed an accreditation requirement on the entire distribution market with the specific intent to harm three minor Distributors and their relationships with any specific pharmacy. *See Fed. Nat'l Mortg. Ass'n v. DuBois*, Civ. No. 15-3787, 2018 WL 5617566, at *3, 12 (D.N.J. Oct. 30, 2018) ("idea" that, when a mortgage loan owner sold a plaintiff's mortgage along with $418 million worth of other loans to another company, the two companies did so with the intent to preclude the plaintiff from participating in a government loan-modification program was "not plausible").

That deficiency also takes us to another, the lack of an allegation of malice. Participants in a market are not required to act in each other's best interests. Even when a defendant has knowledge of a contract and intentionally acts, there is no liability if there is a "valid business justification" for the action. *Lamorte Burns & Co. v. Walters*, 770 A.2d 1158, 1170–71 (N.J. 2001) (citation omitted); *see also Cargill Global Trading v. Applied Dev. Co.*, 706 F. Supp. 2d 563, 575–76 (D.N.J. 2010). The Amended Complaint itself acknowledges a "valid business justification" for the VAWD requirement: OptumRx had concerns about pharmacies' sourcing of medications and wanted to impose

requirements more stringent than existing federal requirements. (Am. Compl. ¶¶ 145–46, 243.) A business's desire to improve its supply chain is not "transgressive of generally accepted standards of common morality or of law"; its incidental effects on the Distributors' relations with pharmacies do not give rise to liability. *Lamorte*, 770 A.2d at 1171 (citation omitted); *see also Baxter Healthcare Corp. v. HQ Specialty Pharma Corp.*, 157 F. Supp. 3d 407, 422 (D.N.J. 2016).

It is true that even where a defendant identifies a valid business purpose, the defendant must still "justify . . . the *means* used," and cannot employ "fraudulent, dishonest, or illegal conduct." *Lamorte*, 770 A.2d at 1171 (emphasis added). The Distributors allege that OptumRx acted unjustifiably in implementing the VAWD requirement in three ways, but none of them changes my tentative conclusion.

First, the Distributors allege that OptumRx notified pharmacies that they would face penalties for noncompliance but did not follow through; this conduct, they say, amounts to intimidation. (Am. Compl. ¶¶ 353–62.) Imposing a contractual requirement and setting forth the penalties for noncompliance cannot be called "intimidation" or deemed wrongful. Moreover, it is not clear how this allegation has anything to do with the Distributors, or what import it has regarding intentional interference. That is, if complying with the VAWD requirement causes pharmacies to drop their relations with the Distributors, as the Amended Complaint alleges, then *how* OptumRx ensures compliance should not much matter to the Distributors. And the complaint that OptumRx did *not* follow through, if that is the complaint, is difficult to fathom.

Second, the Distributors allege that the VAWD requirement is anticompetitive because it squeezes secondary distributors out of the market. These smaller distributors, they say, have difficulty complying with the requirement in comparison to primary distributors. (*Id.* ¶¶ 363–68.) That the VAWD requirement affects market segments differently does not make it malicious. *See Lamorte*, 770 A.2d at 1171 ("[W]here a plaintiff's loss of business

31

is merely the incident of healthy competition, there is no compensable tort injury.").

Finally, the Distributors allege that, although the VAWD requirement violates New York Public Health Law § 280-c, OptumRx still enforces the requirement against its New York pharmacies. (Am. Compl. ¶¶ 369–79). The Distributors seem to be alleging that the VAWD requirement, though illegal in New York, caused New York pharmacies to cease relations with them. (Pl. Opp. at 47–48.) But I do not accept the premise of the argument, *i.e.,* that the VAWD requirement violates § 280-c. As noted above, § 280-c(2)(i) does no more than provide that, when conducting an invoice audit of a pharmacy (which the statute does not define), a PBM must accept an invoice from a registered wholesaler as sufficient proof that the transaction occurred. So it is hard to see how the statute has anything to do with a PBM's decision to impose sourcing requirements in its contracts with pharmacies. Put another way, OptumRx could accept an invoice from a wholesaler in connection with an audit as evidentiary proof that a purchase was made, in compliance with the statute, yet still penalize that same pharmacy for purchasing from a non-VAWD wholesaler. Because the Distributors have not shown a plausible violation of § 280-c, or a connection to their grievance, their allegation of malice based on the imposition of the VAWD requirement on New York pharmacies fails to achieve plausibility.

Because the Amended Complaint fails to allege intentional interference or malice, the motion to dismiss Counts 6, 7, and 8 is granted.

### H. Count 9: NJCFA

Count 9 is a claim against NABP for violations of the NJCFA. (Am. Compl. ¶¶ 397–405.) (Again, this claim is alleged in the alternative if the Court finds that NABP is not a state actor.) The NJCFA is a consumer protection statute that applies "to products and services sold to consumers in the popular sense." *Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 514 (3d Cir. 2006) (citation omitted). "To state a claim under the NJCFA, a plaintiff must allege

that the defendant engaged in an unlawful practice that caused an ascertainable loss to the plaintiff." *Frederico v. Home Depot*, 507 F.3d 188, 202 (3d Cir. 2007) (citation omitted). The main NJCFA provision, N.J. Stat. Ann. § 56:8-2, prohibits unlawful practices "in connection with the sale or advertisement of any merchandise or real estate." *D'Agostino v. Maldonado*, 78 A.3d 527, 537 (N.J. 2013). While § 56:8-2 can apply to a variety of practices, *Gonzalez v. Wilshire Credit Corp.*, 25 A.3d 1103, 1115 (N.J. 2011), certain sections of the statute specify particular practices that are unlawful, *see Czar, Inc. v. Heath*, 966 A.2d 1008, 1011–12 (N.J. 2009).

Count 9 relies on one such section, § 56:8-2.1, which provides as follows:

> It shall be an unlawful practice for any person to operate under a name or in a manner which wrongfully implies that such person is a branch of or associated with any department or agency of the Federal Government or of this State or any of its political subdivisions . . . .

Count 9 alleges that NABP "wrongfully implied" that it was a government agency or "act[ed] with the sanction of" government agencies. (Am. Compl. ¶ 399.) As a result, NABP "cause[d] Plaintiffs to reasonably believe that NABP is authorized by a government agency to oversee the enforcement of the drug supply chain" (*id.* ¶ 403), causing the Distributors to suffer ascertainable losses (*id.* ¶ 404). Count 9 fails for three reasons.

First, there is no consumer transaction. *Cetel*, 460 F.3d at 514. Although not clearly alleged, the Distributors' theory presumably is that NABP induced them to seek VAWD accreditation by falsely representing that NABP possessed state power.[23] However, drug supply chain accreditation is not a consumer good or service; it is "not available to the general public and w[as] never marketed as such." *Id.* at 514; *see also City of Atlantic City v. Zemurray St. Cap., LLC*, 192 F. Supp. 3d 563, 569 (D.N.J. 2016) (dismissing an NJCFA claim

---

[23]   The Distributors have also failed to provide substantial arguments in opposition to Count 9. Rather, their brief (in less than two pages) states the general legal standards for an NJCFA claim, repeats the Amended Complaint's allegations, and announces that the Amended Complaint sufficiently pleads the elements.

based on loan administrative services, which are "a complex service that will require individualization to suit the needs of the parties to the contract, and the general consumer public is not seeking [them]"). Section 56:8-2.1 is aimed at prohibiting sellers of consumer products and services from inducing consumers into transactions using a false imprimatur of government power. *See Hoffman v. Loiry*, No. A-2640-14T3, 2016 WL 3693957, at *6 (N.J. Super. Ct. App. Div. July 13, 2016) (defendant sold tickets to a conference falsely promising that government officials would be speakers). An accreditation service provided to specific businesses does not meet that description.

Second, even assuming *arguendo* that VAWD accreditation is a consumer good or service, the Amended Complaint contradicts any allegation that NABP wrongfully implied that it was, or was associated with, a government agency. The Amended Complaint alleges that NABP is a "non-profit corporation" that holds itself out as a professional "association." (Am. Compl. ¶ 14) And the Complaint itself appears to acknowledge NABP does not *wrongfully imply* that it is associated with government agencies—it merely represents that it "cooperat[es] with" government agencies "having similar objectives." (*Id.* ¶ 15.)

Third, the Distributors do not allege an ascertainable loss. At the pleading stage, plaintiffs must provide a reasonable valuation that "quantif[es] the difference in value between the promised product and the actual product received." *AZEK*, 82 F. Supp. 3d at 624 (citation omitted). The Distributors make no attempt to explain what their ascertainable loss is. (Am. Compl. ¶ 404.) For this reason, too, the NJCFA claim cannot survive.

For these reasons, Count 9 will be dismissed.

**III.    CONCLUSION**

For the reasons set forth above, OptumRx's and NABP's motions to dismiss are granted as to all counts.

A separate order will issue.

Dated: December 4, 2020

/s/ Kevin McNulty

_____

**Hon. Kevin McNulty**
**United States District Judge**

35